**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **VERGIE L. REDUS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 1:05CV146 CAS(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Vergie L. Redus for a Period of Disability and Disability Insurance

Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title

XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a

Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in

Support of Plaintiff's Complaint. (Document Number 16). Defendant has filed a Brief in Support

of the Answer. (Doc. No. 17).

**Procedural History**

On November 3, 2003, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on July 15, 2003. (Tr. 253-55). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated March 22, 2005. (Tr. 217-18, 236-39, 61-

74).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on August 8, 2005.

(Tr. 100-03).  Plaintiff filed suit in the United States District Court for the Eastern District of

Missouri, and the case was remanded to the Agency because the tape of the administrative hearing

was inaudible.  (Tr. 8).  On September 26, 2006, following a supplemental hearing, an ALJ

rendered a decision, in which he found that plaintiff was not under a disability as defined by the

Social Security Act.  (Tr. 6-22).  Thus, this decision of the ALJ stands as the final decision of the

Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on July 5, 2006.  (Tr. 25).  Plaintiff was present

and was represented by counsel.  (Id.).  A vocational expert, Gary Weimholt, was also present.

(Id.).  The ALJ began by admitting the exhibits into the record.  (Tr. 26).  Plaintiff's attorney then

requested that plaintiff's onset of disability date be amended to July 15, 2003.  (Tr. 27).  The ALJ

indicated that plaintiff's onset date would be amended.  (Id.).

The ALJ then examined plaintiff, who testified that she resides in Gatewood, Missouri.

(Tr. 28).  Plaintiff stated that she was born on January 19, 1957.  (Id.).  Plaintiff testified that she

lives with her friend James Murphy and their fourteen-year-old daughter Jackie Murphy.  (Id.).

Plaintiff stated that she is single.  (Tr. 29).  Plaintiff testified that she completed the tenth grade

and then received her GED.  (Id.).  Plaintiff stated that she has not received any additional

education or job-related training.  (Id.).

Plaintiff testified that she has a driver's license.  (Id.).  Plaintiff stated that she drove to the

hearing.  (Id.).  Plaintiff testified that she drives to her attorney's office and to doctor appointments.  (Id.).  Plaintiff stated that she usually drives about three days a week.  (Id.).

Plaintiff testified that she smokes about two packages of cigarettes a day.  (Tr. 30). Plaintiff stated that she drinks three to four beers a day.  (Id.).

Plaintiff testified that she had no source of income at the time of the hearing.  (Id.). Plaintiff stated that she has borrowed money from her son and from James Murphy.  (Id.). Plaintiff testified that Mr. Murphy was employed part-time and he receives Social Security retirement benefits.  (Id.).  Plaintiff stated that Mr. Murphy was 67 years of age.  (Id.).  Plaintiff testified that Mr. Murphy also draws Social Security benefits on their daughter.  (Id.).

Plaintiff stated that she last worked in July of 2003 at Waterloo Industries in Pocahontas, Arkansas.  (Id.).  Plaintiff testified that she worked on a weld line welding covers on metal toolboxes.  (Tr. 31).  Plaintiff stated that she was required to lift heavy objects at this position. (Id.).  Plaintiff testified that she only worked on the weld line for about a week, but she worked for Waterloo Industries for four years.  (Id.).

Plaintiff stated that prior to working on the weld line, she worked on a paint line.  (Id.). Plaintiff testified that this position involved standing in one spot for eight to eleven hours operating a paint gun.  (Tr. 32).  Plaintiff stated that she performed this position for two years. (Id.).  Plaintiff testified that she stopped performing the painting work because she was laid off temporarily and then was called back on the weld line.  (Id.).

Plaintiff stated that she stopped performing the welding work in July of 2003 because she was placed on medical leave due to health problems.  (Id.). Plaintiff testified that she was unable to work at that time because she was in too much pain.  (Id.).

Plaintiff stated that she also performed some assembly work at Waterloo Industries. (Tr. 33). Plaintiff testified that she assembled toolboxes. (Id.). Plaintiff stated that she performed this work every month to two months during the four to five years that she worked at Waterloo Industries. (Id.).

Plaintiff testified that she worked at M & W Woodworks prior to working at Waterloo Industries. (Id.). Plaintiff stated that she built cabinets and doors at this position. (Id.). Plaintiff testified that she left this position because she was forced to perform physical labor and serve as the shop manager. (Id.). Plaintiff stated that as a shop manager, she had to schedule and oversee jobs. (Id.).

Plaintiff testified that she worked at In-Home Health Service prior to working at M & W Woodworks. (Tr. 34). Plaintiff stated that she performed this work for four months. (Id.). Plaintiff testified that she left this position because she was unhappy with the work. (Id.). Plaintiff stated that she had to lift patients in and out of bathtubs at this position and she was uncomfortable with the heavy lifting. (Id.).

Plaintiff testified that she has neck, shoulder, and back problems from both disc problems and a degenerative spine. (Id.). Plaintiff stated that she has undergone two surgeries on her right arm for tennis elbow[1] and ulnar nerve[2] and she still has problems with her right arm. (Id.). Plaintiff testified that she injured her left hip in a car accident in 1980, and she still has pain in her left hip. (Id.). Plaintiff stated that she still experiences pain in her neck and shoulders.

---

[1]Chronic inflammation at the origin of the extensor muscles of the forearm as a result of unusual or repetitive strain. Stedman's Medical Dictionary, 619 (28th Ed. 2006).

[2]Nerve that passes down the arm from the shoulder to the hand. See Stedman's at 1303.

(Tr. 35). Plaintiff testified that her tail bone was broken at some time in her life and she still

experiences significant pain. (Id.). Plaintiff stated that she has pain in her right foot, right ankle,

and right hip. (Id.). Plaintiff testified that she also experiences tingling and numbness in her right

hand. (Id.). Plaintiff stated that she is being treated by Dr. Moore in Poplar Bluff, who is an

orthopedist. (Id.). Plaintiff testified that she started seeing Dr. Moore in April or May of 2006.

(Tr. 36).

Plaintiff's attorney then examined plaintiff, who testified that her neck hurts in her

shoulders up to her head and causes her to experience frequent headaches. (Id.). Plaintiff stated

that she underwent an MRI on July 6, 2004, at Poplar Bluff Medical Partners. (Id.). Plaintiff

testified that she experiences pain in both arms. (Tr. 37). Plaintiff stated that she experiences

headaches due to her neck problems at least once a day. (Id.). Plaintiff testified that the headache

goes away within a half hour if she takes aspirin or Ultracet[3] and lies down. (Id.). Plaintiff stated

that she has more severe headaches once a week to once every two weeks that require her to lie

down for two to six hours. (Id.).

Plaintiff testified that she has ruptured discs in her lower back at L4-5.[4] (Tr. 38). Plaintiff

stated that her back pain occasionally goes down through her hips and into her legs. (Id.).

Plaintiff testified that she has been experiencing back pain since December of 2001. (Id.).

---

[3]Ultracet is indicated for the short-term management of acute pain. See Physician's Desk
Reference (PDR), 2509 (57th Ed. 2003).

[4]The back is comprised of the cervical, thoracic and lumbar regions. In common terms,
the cervical region of the spinal column is the neck; the thoracic region is the main part of the
back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic
vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra.
The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information
Systems for Lawyers, § 6:27 (1993).

Plaintiff stated that she started seeing a chiropractor in January of 2002.  (Id.).

Plaintiff testified that her right arm is inflamed.  (Tr. 39).  Plaintiff stated that Dr. Moore recently administered injections in her right shoulder.  (Id.).  Plaintiff testified that she was scheduled to see Dr. Moore for more injections.  (Id.).  Plaintiff stated that the inflammation in her right arm causes burning, tingling, and numbness in her fingers.  (Id.).  Plaintiff testified that she is right-hand dominant.  (Id.).  Plaintiff stated that the problems with her hand affect her ability to pick things up and manipulate objects.  (Tr. 40).  Plaintiff testified that she cannot lift a gallon of milk.  (Id.).  Plaintiff stated that she can lift light objects but she has to use the other hand.  (Id.).

Plaintiff testified that she has broken her tail bone.  (Id.).  Plaintiff stated that her tail bone bothers her if she has to sit for long periods.  (Id.).  Plaintiff testified that she can sit for twenty to thirty minutes before she experiences pain.  (Id.).  Plaintiff stated that she drove over 128 miles to the hearing and that she had to stop three times.  (Id.).

Plaintiff testified that she has undergone surgery on her right foot and ankle.  (Id.).  Plaintiff stated that she still experiences severe burning pain in her right ankle and foot.  (Id.).  Plaintiff testified that she had to have one of the surgeries re-done.  (Tr. 41).  Plaintiff stated that the last surgery she had was on May 30, 2006.  (Id.).  Plaintiff testified that she does not know yet if the surgery resulted in improvement.  (Id.).  Plaintiff stated that Dr. Clint Vanlandingham performed the last surgery.  (Id.).

Plaintiff testified that she has bladder problems.  (Id.).  Plaintiff stated that her bladder leaks and she has to use the restroom frequently.  (Id.).  Plaintiff testified that she uses the restroom once to twice every thirty to forty minutes.  (Id.).  Plaintiff stated that she has seen Dr.

Thomas Joseph and a gynecologist for her bladder problem.  (Tr. 42).  Plaintiff testified that she has been diagnosed with an abnormal bladder.  (Id.).

Plaintiff stated that she has been diagnosed with hypertension,[5] for which she takes medication.  (Id.).  Plaintiff testified that the medication controls her hypertension somewhat although her blood pressure still occasionally runs high.  (Id.).

Plaintiff stated that she did not think she could perform a job where she could sit or stand, and where she did not have to lift anything heavy.  (Id.).  Plaintiff testified that she could not perform such a job because she is unable to sit for long periods of time and she experiences pain.  (Id.).  Plaintiff stated that she has to alternate between standing, walking, and lying down.  (Id.).

Plaintiff testified that she also gets depressed.  (Id.).  Plaintiff stated that she has seen Rosemary Walgray for her depression.  (Tr. 43).  Plaintiff testified that she takes Lexapro[6] for her depression, which helps somewhat.  (Id.).  Plaintiff stated that she has crying spells.  (Id.).

Plaintiff testified that she also has chronic bronchitis.[7]  (Id.).  Plaintiff stated that her doctors have advised her to quit smoking.  (Id.).  Plaintiff testified that she has tried to cut back on her smoking but when she gets depressed or nervous she smokes more.  (Id.).

Plaintiff stated that she has owned a restaurant on two occasions.  (Id.).  Plaintiff testified that she closed her last restaurant in July of 1988.  (Tr. 44).  Plaintiff stated that she owned a restaurant from 1985 through 1988.  (Id.).

The ALJ then examined the vocational expert, Gary Weimholt, who testified that

_____

[5]High blood pressure.  Stedman's at 927.

[6]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 3532.

[7]Inflammation of the mucous membrane of the bronchi.  Stedman's at 270.

plaintiff's work at Waterloo Industries would be classified under two titles. (Tr. 45). Mr. Weimholt stated that the work would be classified as assembler of metal furniture, which would include the toolbox assembly and the welding. (Id.). Mr. Weimholt testified that plaintiff's work at Waterloo Industries would also be classified as metal sprayer. (Id.). Mr. Weimholt stated that both jobs are semi-skilled and medium. (Id.). Mr. Weimholt testified that plaintiff worked as a cabinet maker supervisor, which would be classified as skilled and medium. (Id.). Mr. Weimholt stated that plaintiff worked as a cabinet maker, which is skilled and medium. (Id.). Mr. Weimholt testified that plaintiff also worked as a home health aide, which is a medium, semi-skilled position. (Tr. 46).

The ALJ asked Mr. Weimholt to assume a hypothetical individual with the following limitations: able to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds; stand or walk for up to six hours in an eight-hour day with normal breaks; sit for up to six hours in an eight-hour day; unable to climb ladders or scaffolds; able to push or pull with the right dominant arm ten pounds or less occasionally; and should avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery. (Id.). Mr. Weimholt testified that such an individual would not be able to perform any of plaintiff's past jobs. (Id.).

Mr. Weimholt stated that the individual would be able to perform other jobs. (Id.). Mr. Weimholt testified that the individual could perform simple cashiering jobs. (Id.). Mr. Weimholt stated that there are approximately 10,000 simple cashiering jobs in the state of Missouri. (Tr. 47). Mr. Weimholt testified that the individual could also perform simple, unskilled assembly jobs at the sedentary level that do not require pushing and pulling with the right dominant hand. (Id.). Mr. Weimholt stated that there are approximately 4,500 such jobs in Missouri. (Id.).

The ALJ next asked Mr. Weimholt to reduce the lifting ability from the first hypothetical to ten pounds on an occasional basis, and to reduce standing and walking to no more than a total of two hours in an eight-hour day. (Id.). Mr. Weimholt testified that these limitations would not preclude the simple sedentary jobs but it would limit the number of cashiering jobs to approximately 1,000. (Id.).

Plaintiff's attorney then examined Mr. Weimholt, who testified that the jobs discussed in hypothetical number two would require the frequent use of the right hand. (Tr. 48). Mr. Weimholt stated that an individual who could not frequently use her right hand would not be able to perform the jobs discussed in hypothetical number two. (Tr. 49).

## B.    **Relevant Medical Records**

The record reveals that plaintiff sought treatment from Les Lamoureux, D.C., from January 2002 through August 2002, for complaints of neck, upper back, left shoulder, left arm, and left wrist pain after she was involved in a motor vehicle accident in December 2001. (Tr. 496-517). On August 8, 2002, Dr. Lamoureux indicated that plaintiff was sign and symptom free. (Tr. 496). Plaintiff's exam was unremarkable. (Id.). Plaintiff was released with no work restrictions. (Tr. 497).

Plaintiff underwent a cervical MRI on June 7, 2002, which revealed C5-6 disc and ligamentous degenerative changes with broad based annular[8] bulging not associated with significant diminishment of spinal canal area and no fracture. (Tr. 520).

Plaintiff saw S. Winters, M.D. on March 13, 2003, for complaints of right arm discomfort, bilateral knee pain, and right foot pain. (Tr. 495). Plaintiff reported that these symptoms had

---

[8]Ring-shaped. Stedman's at 113.

been ongoing for about two years.  (Id.).  Dr. Winters noted that plaintiff smoked two packs of

cigarettes a day and used alcohol.  (Id.).  Upon physical examination, plaintiff demonstrated

limited right shoulder mobility.  (Id.).  Plaintiff's right elbow and knees were tender.  (Id.).  Dr.

Winters' assessment was right shoulder impingement syndrome,[9] right elbow lateral

epicondylitis,[10] and right foot Morton's neuroma.[11]  (Id.).  Dr. Winters administered injections in

plaintiff's right elbow and right shoulder, and prescribed therapy.  (Id.).

Plaintiff presented to Thomas Joseph, M.D. on July 15, 2003, with complaints of pain and

swelling in her right elbow since October of 2002.  (Tr. 459).  Plaintiff denied experiencing any

neck pain.  (Id.).  Plaintiff reported tingling and numbness in her right upper extremity.  (Id.).

Upon physical examination, plaintiff had slight tenderness in the elbow.  (Id.).  X-rays of the right

elbow did not show any bony abnormality.  (Tr. 460).  Plaintiff had very minimal tenderness in her

neck, with free and painless movement of the neck.  (Id.).  Plaintiff's shoulder movements were

normal, with no restriction.  (Id.).  Plaintiff had no sensory or motor deficit in the right upper

extremity.  (Id.).  Dr. Joseph diagnosed plaintiff with possible Tennis elbow, right side; and

possible radial tunnel syndrome.[12]  (Id.).  Dr. Joseph scheduled a nerve conduction study to rule

---

[9]Pain on elevating arm and tenderness on deep pressure over the rotator cuff; due to pressure of an injured or inflamed tendon or inflamed bursa.  See Stedman's at 1915.

[10]Inflammation of the lateral aspect of the elbow.  See Stedman's at 653.

[11]A painful, tender focal mass lesion on one of the plantar interdigital nerves of the foot, most often that which is situated between the third and fourth metatarsal bones.  Stedman's at 1311.

[12]Pain in the lateral aspect of the elbow and forearm without motor or sensory deficits, resulting from compression of the radial nerve as it passes the elbow and the proximal forearm. Stedman's at 1911.

out any nerve pathology.  (Id.).

Plaintiff underwent a nerve conduction study on August 7, 2003, which revealed electrophysiologic evidence of right ulnar nerve compression at or around the elbow.  (Tr. 481-82).

Plaintiff underwent a nerve conduction study on September 10, 2003, which revealed normal motor and sensory nerve findings and no evidence of nerve palsy.  (Tr. 480).

On September 25, 2003, Dr. Joseph performed ulnar nerve release surgery.  (Tr. 465).

Plaintiff saw Jeffrey A. Kornblum, M.D. for a neurological examination on October 9, 2003.  (Tr. 492-93).  Plaintiff complained of neck and left arm pain since December 2001. (Tr. 492).  Dr. Kornblum discussed the option of cervical surgery and the importance of quitting smoking for plaintiff's spinal health.  (Tr. 493).

Dr. Joseph performed tennis elbow release surgery on December 4, 2003.  (Tr. 463-64).

Plaintiff saw neurologist Shahid K. Choudhary on December 22, 2003, with complaints of continued right elbow pain.  (Tr. 477-79).  Plaintiff reported elbow pain for about three years. (Tr. 477).  Plaintiff also complained of neck pain that radiates to her left shoulder and wrist.  (Id.). Upon physical examination, plaintiff had full strength in the left upper and both lower extremities, and her strength was 4 out of 5 in the right upper extremity.  (Tr. 479).  Dr. Choudhary's impression was right ulnar nerve palsy[13] with no reported improvement after surgery; right arm pain, possibly due to ulnar nerve palsy; chronic neck pain, with no evidence of radiculopathy; and history of hypertension.  (Id.).

Plaintiff attended physical therapy for her right elbow pain in December 2003.  (Tr. 468-

---

[13]Paralysis or paresis (partial paralysis).  Stedman's at 1408.

74).

Plaintiff saw Dr. Joseph on February 18, 2004, with complaints of bilateral hip pain. (Tr. 455). Plaintiff had slight tenderness in the hips. (Id.). Dr. Joseph ordered x-rays. (Id.).

Plaintiff saw Dr. Joseph on February 24, 2004, for a follow-up. (Tr. 454). X-rays of the hip revealed no bony abnormality. (Id.). Dr. Joseph's impression was tendonitis.[14] (Id.). He prescribed anti-inflammatory medication. (Id.).

Plaintiff saw Dr. Joseph on April 7, 2004, with complaints of left hip pain. (Tr. 453). Dr. Joseph noted persistent tenderness over the left hip. (Id.). He ordered an MRI. (Id.).

Plaintiff saw Dr. Joseph on April 14, 2004, for a follow-up. (Tr. 452). Dr. Joseph noted that the MRI scan of the knee and hip did not show any bony abnormalities and that no surgical treatment could be done. (Id.). Dr. Joseph recommended conservative treatment with anti-inflammatory medication. (Id.).

Plaintiff saw Geetha Komatireddy, M.D. for a rheumatology consultation on June 16, 2004. (Tr. 406-11). Dr. Komatireddy's impression was cervical radiculopathy.[15] (Tr. 411).

Plaintiff underwent an MRI for the cervical spine on July 6, 2004, which revealed a disc bulge at C5-6 without disc herniation, and disc degenerative changes at all levels. (Tr. 167).

Plaintiff presented to K. Douglas Green, M.D. on September 2, 2004, with complaints of bilateral low back pain, neck pain, and shoulder pain. (Tr. 377-80). Dr. Green's assessment was

---

[14]Inflammation of a tendon. Stedman's at 1944.

[15]Disorder of the spinal nerve roots. Stedman's at 1622.

intervertebral disc disorder[16] with myelopathy,[17] cervical region; neck pain; paresthesia;[18] and low back pain.  (Tr. 379).

On September 9, 2004, Zackwrie Parr, D.P.M. performed surgical excision of plaintiff's neuroma.  (Tr. 396).

Plaintiff saw Dr. Green for a follow-up on October 11, 2004.  (Tr. 375-76).  Plaintiff reported no change in her symptoms.  (Tr. 375).  Dr. Green's assessment was intervertebral disc disorder with myelopathy, cervical region; and low back pain.  (Tr. 376).

Plaintiff underwent an MRI of the lumbar spine on October 14, 2004, which revealed degenerative annular bulging at L3-4, a small midline subligamentous disc protrusion at L4-5 with mild facet arthrosis,[19] and moderate facet arthrosis at L5-S1.  (Tr. 385).

Plaintiff underwent a nerve conduction study on November 12, 2004, which revealed no electrophysiologic evidence of carpal tunnel syndrome or radiculopathy.  (Tr. 371-72).

Clint Vanlandingham, D.P.M. performed a right ankle arthroscopy[20] and debridement on December 14, 2004.  (Tr. 366-67).  Plaintiff's preoperative diagnosis was right ankle synovitis[21] and capsulitis.[22]  (Tr. 366).

---

[16]Degeneration of the intervertebral discs, which are the intervals between the bodies of two vertebral bones.  See Medical Information Systems for Lawyers, § 6:201.

[17]Disorder of the spinal cord.  Stedman's at 1270.

[18]A spontaneous abnormal usually nonpainful sensation.  Stedman's at 1425.

[19]Degenerative joint changes.  Stedman's at 162.

[20]Endoscopic examination of the interior of a joint.  Stedman's at 162.

[21]Inflammation of a joint.  See Stedman's at 1920.

[22]Inflammation surrounding a joint.  See Stedman's at 303.

Plaintiff presented to Clara N. Applegate, M.D. for a neurology consultation on April 11, 2005. (Tr. 211-13). Plaintiff complained of right arm pain and weakness. (Tr. 211). Plaintiff's medications were listed as Micardis,[23] Zantac,[24] Lexapro, Ultracet, and Singulair.[25] (Tr. 212). Upon physical examination, plaintiff's right arm strength was somewhat limited by pain. (Id.). Plaintiff had decreased sensation in the back of her forearm and in her hand. (Id.). Plaintiff's gait was normal. (Tr. 213). Dr. Applegate's impression was right arm pain and numbness, sensory losses consistent with a radial nerve injury. (Id.). She recommended an EMG[26] and nerve conduction studies. (Id.).

Plaintiff saw Dr. Applegate for a follow-up on June 8, 2005, at which time plaintiff continued to complain of pain in the right upper extremity that she rated as an eight to ten on a scale of one to ten. (Tr. 180-81). Plaintiff indicated that medications, surgery, and physical therapy provided about ten percent relief of her pain. (Tr. 180). Plaintiff also reported having problems with depression. (Id.). Physical examination revealed no evidence of weakness in any of the muscles of the right upper extremity. (Id.). Plaintiff's sensory examination, gait, and coordination were normal. (Id.). Nerve conduction studies were remarkable only for slowing of ulnar conduction across the right elbow. (Id.). The EMG showed no evidence to explain her symptoms. (Tr. 181). Dr. Applegate's impression was symptoms that are probably related to

[23]Micardis is indicated for the treatment of hypertension. See PDR at 1045.

[24]Zantac is indicated for the treatment of gastric ulcer or GERD. See PDR at 1689.

[25]Singulair is indicated for the treatment of asthma. See PDR at 2088.

[26]Abbreviation for electromyogram, which is a graphic representation of the electric currents associated with muscular action. Stedman's at 622.

plaintiff's ulnar neuropathy.  (Id.).  Dr. Applegate started plaintiff on Neurontin[27] and discussed alternative sleeping positions.  (Id.).

Plaintiff saw Dr. Applegate for a follow-up on August 24, 2005, for cervical disk disease with spondylosis,[28] C5-6, right ulnar neuropathy, and torticollis.[29]  (Tr. 179).  Plaintiff reported no improvement.  (Id.).  Plaintiff had tenderness and muscle spasm throughout the trapezius[30] muscle and behind the elbow.  (Id.).  Dr. Applegate expressed the opinion that the majority of plaintiff's pain was myofascial[31] in origin.  (Id.).  She stated that there was not sufficient pathology on plaintiff's MRI to explain her pain.  (Id.).  Dr. Applegate recommended physical therapy.  (Id.).

On October 18, 2005, Dr. Applegate noted that plaintiff did not attend physical therapy because she had been to physical therapy before.  (Tr. 178).  Plaintiff reported pain in her left shoulder, scapula,[32] trapezius, and all the way up and down the spinal access into the back and hips.  (Id.).  Plaintiff indicated that her foot doctor was contemplating surgery on her foot.  (Id.).  Plaintiff stated that Social Security Disability was "the only way that she can go at this point."  (Id.).  Dr. Applegate advised plaintiff that her MRI abnormalities were not severe and that her

---

[27]Neurontin is indicated for the management of postherpetic neuralgia.  See PDR at 2565.

[28]Stiffening of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.  Stedman's at 1813.

[29]A contraction or shortening of the muscles of the neck.  Stedman's at 2002.

[30]Extrinsic muscle of the shoulder.  Stedman's at 1256.

[31]Myofascial pain syndrome is characterized by muscle pains when there is nothing apparently wrong with the muscle.  These pains are often accompanied by localized spasm which can be induced by something touching on a sensitive area on the muscle.  Myofascial pain syndrome can follow trauma and it is often due to working in awkward positions or postures.  See Medical Information Systems for Lawyers, § 6:201.

[32]Shoulder blade.  Stedman's at 1725.

MRI findings did not "condemn her to a lifetime of pain." (Id.). Dr. Applegate recommended

that plaintiff start an aquatics exercise program and quit smoking because smoking aggravates her

joint pain. (Id.).

On May 30, 2006, Dr. Vanlandingham performed surgical excision of plaintiff's neuroma.

(Tr. 119-20).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on July 15, 2003.

2. The claimant has not engaged in substantial gainful activity since at least July 15, 2003.

3. The medical evidence establishes that the claimant has a prior history of right ulnar nerve compression and right tennis elbow resolved through treatment and not lasting twelve months in duration. The claimant has hypertension which is not severe. The claimant has a history of headaches but such have not been severe for twelve consecutive months in duration. The claimant has a history of right ankle synovitis/capsulitis and sinus tarsi syndrome as well as a right Morton's neuroma but such were not severe for twelve consecutive months in duration. The claimant has a diagnosis of chronic obstructive pulmonary disease. However, the record does not support a finding of a severe medically determinable impairment of chronic obstructive pulmonary disease. The claimant has depression. However, such is not severe. The claimant does have a diagnosis of mild cervical degenerative disc disease as well as osteoarthritic spurring and spondylosis in the cervical spine. However, such do not result in significant nerve or cord impingement. Dr. Applegate reported that diagnostic testing established no severe impairment and no explanation for ongoing neck, shoulder and upper extremity complaints.

4. The claimant does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

5. The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

6. The claimant's impairments preclude: sitting more than six hours per eight hour workday; standing and/or walking more than two hours in an eight hour workday; frequently lifting and carrying more than ten pounds; occasionally lifting and carrying more than twenty pounds; climbing overhead ladders and scaffolds; working around heights and dangerous machinery; and pushing and pulling more than ten pounds with the right arm. Any non-exertional limitations arising from the claimant's non-severe depression do not significantly compromise the residual functional capacity noted above.

7. The claimant cannot perform her past relevant work.

8. The claimant is forty-nine years old. The claimant has a high school education.

9. Based upon the credible testimony of the vocational expert, the claimant can perform other work existing in significant numbers.

10. The claimant has been able to perform other work, existing in significant numbers, since July 15, 2003. The claimant has been able to perform substantial gainful activity since July 15, 2003. The claimant has not been under a disability, as defined under the Social Security Act at any time since July 15, 2003, and through the date of this decision.

(Tr. 20-21).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on November 3, 2003, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits, under Sections 216(i) and 223, of the Social Security Act.

(Tr. 22).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial

gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.     Plaintiff's Claims

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in formulating her residual functional capacity.  Plaintiff next argues that the ALJ erred in assessing the credibility of her subjective complaints of pain and limitation. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

## 1.     Credibility Determination

Plaintiff argues that the ALJ erroneously found her subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 11). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first provided an extensive summary of the objective medical evidence. (Tr. 11-19). The ALJ found that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ first discussed the objective medical findings regarding plaintiff's upper extremity

and cervical pain. (Tr. 12-14). The ALJ noted that a cervical MRI plaintiff underwent in June 2002 revealed degenerative changes but no diminishment or narrowing of the spinal canal and no fracture. (Tr. 12, 520). On July 15, 2003, plaintiff denied neck pain. (Tr. 459). Plaintiff exhibited only very minimal neck tenderness and free and painless neck motion. (Id.). Plaintiff also exhibited full range of motion of the shoulder. (Id.). Plaintiff exhibited no right upper extremity sensory or motor deficit. (Id.). Plaintiff underwent a nerve conduction study on September 10, 2003, which revealed normal motor and sensory nerve findings and no evidence of nerve palsy. (Tr. 480). On December 22, 2003, Dr. Choudhary found no evidence of cervical radiculopathy. (Tr. 479). A July 2004 MRI revealed a disc bulge at C5-6 without disc herniation. (Tr . 167). Nerve conduction studies plaintiff underwent in November 2004 revealed no evidence of radiculopathy or carpal tunnel syndrome. (Tr. 13, 371-72). The ALJ concluded that these objective findings were inconsistent with plaintiff's allegations of a severe and disabling impairment. (Tr. 12).

The ALJ next discussed plaintiff's right arm pain. (Tr. 14). Plaintiff complained of right arm pain and weakness on April 11, 2005. (Tr. 211-13). Plaintiff's right arm strength was only somewhat limited by pain. (Tr. 212). On June 8, 2005, plaintiff's physical examination revealed no evidence of weakness in any of the muscles of the right upper extremity. (Tr. 180). Plaintiff's sensory examination, gait, and coordination were normal. (Id.). Nerve conduction studies were remarkable only for slowing of ulnar conduction across the right elbow. (Id.). An EMG revealed no evidence to explain plaintiff's symptoms. (Id.). At this time, Dr. Applegate simply recommended that plaintiff alternate sleeping positions. (Id.). On August 24, 2005, Dr. Applegate expressed the opinion that plaintiff's pain was myofacial in origin. (Tr. 179). She

stated that there was not sufficient pathology on plaintiff's MRI to explain her pain. (Id.). On October 18, 2005, Dr. Applegate noted that plaintiff had not attended physical therapy. (Tr. 178). At this time, plaintiff stated that Social Security Disability was "the only way she can go at this point." (Id.). Dr. Applegate advised plaintiff that her MRI abnormalities were not severe and that her MRI findings did not "condemn her to a lifetime of pain." (Id.). Instead, Dr. Applegate recommended that plaintiff start an aquatics program and quit smoking. (Id.). The ALJ properly concluded that Dr. Applegate's findings along with the objective findings are inconsistent with allegations of a disabling impairment. (Tr. 15).

The ALJ next discussed plaintiff's foot and ankle impairments. The ALJ noted that plaintiff has been treated for right ankle synovitis and right Morton's neuroma. (Tr. 16). The ALJ, however, stated that these impairments were treated surgically and were thus not severe for twelve consecutive months in duration. (Id.). This finding is supported by the medical record. (Id.).

The ALJ properly noted that plaintiff continued to smoke despite her physicians' advice to stop smoking. (Tr. 18). The medical records reveal that Dr. Kornblum advised plaintiff to quit smoking for plaintiff's spinal health. (Tr. 493). Dr. Applegate also recommended that plaintiff quit smoking because smoking aggravates joint pain. (Tr. 178). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

The ALJ also pointed out that none of plaintiff's treating physicians have imposed any limitations on plaintiff. The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir.

- 23 -

1993)).

The ALJ next noted that there is no evidence of any adverse side effects from plaintiff's medications or evidence that plaintiff's symptoms were not controlled by medication. This is a proper factor, because evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

Finally, the ALJ pointed out that, although plaintiff alleged that she suffered neck, left arm, right upper extremity and foot pain since 2001, she continued to work with these impairments until July of 2003. (Tr. 18, 30). The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**2.**      **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in formulating her residual functional capacity. Specifically, plaintiff contends that the ALJ erred in concluding that plaintiff had the residual

functional capacity to perform the requirements of her past work as a telemarketer with her non-exertional impairments.  Defendant argues that the ALJ properly formulated plaintiff's residual functional capacity.

After properly assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> [t]herefore, after giving the claimant all possible but reasonable benefit of the doubt, including consideration for upper extremity, neck and even foot pain, the undersigned finds that the claimant's impairments preclude, at most: sitting more than six hours per eight hour work day; standing and/or walking more than two hours in an eight hour work day; frequently lifting and carrying more than ten pounds; occasionally lifting and carrying more than twenty pounds; climbing overhead ladders and scaffolds; working around heights and dangerous machinery; and pushing and pulling more than ten pounds with the right arm.  Any non-exertional limitations arising from the claimant's non-severe depression do not significantly compromise the residual functional capacity noted above. The claimant has failed her burden of establishing a more restrictive residual functional capacity.

(Tr. 19).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  See Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ's residual functional capacity determination is not supported by substantial

evidence. The ALJ does not discuss or otherwise point to any medical evidence that supports his conclusions as to plaintiff's residual functional capacity. The ALJ did not obtain the opinion of a state consultative physician, nor did he obtain source statements from plaintiff's treating physicians. Rather, it appears that the ALJ based his assessment entirely on the opinion of the DDS counselor, "Sue Batchelor, SDM, Senior Counselor," a non-physician. (Tr. 306).

Ms. Batchelor expressed the opinion that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and that plaintiff's ability to push or pull was limited in her upper extremities. (Tr. 298). Ms. Batchelor found that plaintiff should never climb ladders, ropes, or scaffolds and that plaintiff should avoid concentrated exposure to hazards. (Tr. 300, 302). Ms. Batchelor also found that plaintiff's ability to reach in all directions and her ability to handle were limited. (Tr. 301). The ALJ posed Ms. Batchelor's assessment in its entirety to the vocational expert in his first hypothetical. (Tr. 46). The ALJ's final residual functional capacity assessment is consistent with Ms. Batchelor's assessment, except that the ALJ found that plaintiff could stand or walk no more than two hours in an eight-hour workday. (Tr. 19). Although the ALJ's assessment is slightly more restrictive than that of Ms. Batchelor, there is no other basis for the ALJ's determination in the record. The ALJ, therefore, erred in basing his residual functional capacity determination on the opinion of a non-physician. See Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712. See also Baldwin, 349 F.3d at 556. Here, there is no medical evidence in the record from any physician addressing plaintiff's ability to

function in the workplace.  Thus, the ALJ's residual functional capacity fails <u>Lauer</u>'s test that the residual functional capacity be supported by *some* medical evidence.  <u>See</u> <u>Lauer</u>**,** 245 F.3d at 703. Additionally, the ALJ  failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace.

Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) days, until March 11, 2008, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this ___29th__ day of February, 2008.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE